1  David M. Birka-White (State Bar No. 85721)
   dbw@birka-white.com
2  Stephen Oroza (State Bar No. 84681)
   soroza@birka-white.com
3  Mindy M. Wong (State Bar No. 267820)
   mwong@birka-white.com
4  BIRKA-WHITE LAW OFFICES
   411 Hartz Avenue, Suite 200
5  Danville, CA  94526
   Telephone:  (925) 362-9999
6  Facsimile:  (925) 362-9970

7  [Additional Counsel Listed on Signature Page]

8  Attorneys for Individual and Representative
   Plaintiff CAMBRIDGE LANE, LLC
9

10            UNITED STATES DISTRICT COURT

11        FOR THE CENTRAL DISTRICT OF CALIFORNIA

12  CAMBRIDGE LANE, LLC, a                Case No. CV 10-06638 GW (PJWx)
    California limited liability company, on
13  behalf of itself and all others similarly   **THIRD AMENDED CLASS
    situated,                                    ACTION COMPLAINT FOR
14                                               DAMAGES, RESTITUTION AND
                                                 INJUNCTION:**
15              Plaintiff,

16  v.                                          **(1) UNFAIR COMPETITION LAW
                                                     (Bus. & Prof. Code § 17200)**
17  J-M MANUFACTURING
    COMPANY, INC., a Delaware               **(2) FALSE ADVERTISING LAW
18  corporation d/b/a J-M PIPE                   (Bus. &  Prof. Code § 17500)**
    MANUFACTURING COMPANY, and
19  DOES 1-10, inclusive,                    **(3) UNJUST ENRICHMENT**

20              Defendants.                  **(4) FRAUD/DECEIT
                                                 (Civ. Code § 1710)**
21
                                            **(5) NEGLIGENT
22                                               MISREPRESENTATION**

23                                          **(6) EXPRESS WARRANTY**

24                                          **(7) IMPLIED WARRANTY**

25                                          **DEMAND FOR JURY TRIAL**

26

27                                          BY FAX

28

                                            THIRD AMENDED CLASS
                                            ACTION COMPLAINT

CAMBRIDGE LANE, LLC ("Plaintiff"), on behalf of itself and all others similarly situated, alleges:

## I. INTRODUCTION

1.     Defendant J-M Manufacturing Company, Inc., a Delaware corporation doing business in California as J-M Pipe Manufacturing Company ("JM"), is in the business of manufacturing and selling PVC pipe for the transmission and distribution of water for fire hydrant systems, exterior supply side piping for building fire suppression systems, potable water systems and other applications.

2.     PVC pipe is used in many applications which are critical to the health and safety of the public, such as fire suppression and the provision of safe drinking water.  The failure of PVC pipe used for water mains can have catastrophic consequences in addition its inability to provide these critical services.  For example, the failure of PVC pipe can result in the undermining of the soil in which the pipe is installed, with the resultant collapse of structures and roadways.

3.     PVC pipe is intended to last at least 50 years and is embedded deep under the surface where it cannot be removed without damage to or demolition of buildings, roadways and other important public structures.

4.     Accordingly, plumbing codes in force in every state in the United States require that PVC pipe comply with standards promulgated by third parties which are intended to ensure that *all* pipe used in the applications meet "minimum standards to safeguard life or limb, health, property and public."  The model plumbing codes which embody these standards specify that violation of the standards is a crime.

5.     For the reasons specified in Paragraphs 2 through 4, among many others, it is essential that manufacturers of PVC pipe assure purchasers of their products that *every foot* of pipe they sell complies with strict safety standards before it is installed.

6.     There are two types of organizations referred to in plumbing codes

THIRD AMENDED CLASS
ACTION COMPLAINT

which supply minimum standards for PVC pipe: (1) organizations which maintain lists of products which comply with their standards ("certification bodies"); and (2) organizations which provide standards for PVC pipe ("standards bodies") but do not maintain lists of organizations which meet their standards.

7.     As detailed below, each of the standards bodies requires, *inter alia*, that: (1) the pipe meet specified testing standards; and (2) the manufacturer employ practices, such as periodic testing, designed to ensure that *all of the pipe manufactured by the manufacturer* consistently meets those standards.  The second of these two criteria is critical to the success of the standard because there is no practical means for the purchaser to test the pipe before it is installed and no effective way to "recall" PVC pipe which is suspected of falling below minimum safety standards.

8.     Under the rules promulgated by the standards bodies, the assertion by a manufacturer that it manufactures products meeting these standards constitutes a representation by the manufacturer that it has ensured by appropriate testing and other quality control measures that the pipe it sells meets the standard. Accordingly, it is a material misrepresentation for a manufacturer to claim that its product meets the standard if it: (1) does not test and control quality as required by the standard; (2) changes the formula or production process without testing the new pipe to ensure that it meets relevant standards; or (3) becomes aware that any significant amount of the pipe it produces does not meet any requirement of the standard.

9.     The two certification bodies relevant to this action each require that the pipe submitted by the manufacturer to qualify for the listing be "representative" of pipe sold by the manufacturer to the public.  To be "representative," the pipe must – at a minimum – be manufactured by the same process and using the same materials as the pipe submitted for listing.  The use by the manufacturer of markings on the pipe indicating that the pipe qualifies for listing (the "listing mark") is prohibited if the marked pipe is not manufactured by the same process and  using the same

THIRDAMENDED CLASS
ACTION COMPLAINT

1    materials as the pipe submitted for certification.

2          10.    Each certification body also  requires that the manufacturer maintain a

3    quality control program, including regular testing, to ensure continued compliance

4    with the standard and to further ensure that *all pipe sold by the manufacturer* meets

5    the criteria specified by the certification organization.

6          11.    The agreements between the manufacturer and the certification body

7    provide that the use by the manufacturer of a listing mark constitutes a

8    representation both that the mark is used in a manner consistent with the rules of the

9    certification body and that the manufacturer has ensured by appropriate quality

10    control measures that the pipe meets the standards of the certification body.

11          12.    Accordingly, it is a material misrepresentation for a manufacturer to

12    claim that its product qualifies for listing – or meets the standards related to the

13    listing – if the manufacturer: (1) changes the formula or production process for the

14    product; (2) does not institute appropriate quality control measures; or (3) becomes

15    aware that any significant amount of its pipe fail any tests required by the

16    certification body.  If the certification body becomes aware that the manufacturer's

17    product fails even a small number of tests – or fails to meet any other requirement

18    for listing – the listing body will prohibit the manufacturer from selling pipe

19    bearing the relevant listing mark.

20          13.    Because PVC pipe is required by building codes to bear the relevant

21    listing marks and/or satisfy standards promulgated by the standards bodies, and

22    because the consequences of installing potentially non-compliant pipe are so severe,

23    purchasers of PVC pipe will not purchase pipe which does not, or might not, meet

24    relevant testing or listing standards.  PVC pipe which does not assuredly comply

25    with all relevant standards could not be sold any price and has no market value.

26          14.    For the same reasons, PVC pipe which does not, or might not, meet

27    relevant testing or listing standards is not merchantable and is unfit for the uses for

28    which such pipe is sold.

THIRDAMENDED CLASS
ACTION COMPLAINT

15.    From 1997 to the present, JM knowingly and falsely represented that PVC pipe it sold to the public qualified for listing marks and met relevant standards.  These representations were false because, *inter alia*:  (1) the formula and production process used to obtain a listing of the pipe or pass relevant tests were different from those used for pipe sold to its customers; (2) JM did not institute or maintain appropriate quality control measures; and (3) JM became aware that a significant percentage of its pipe fell below the minimum standards required by the certification and standards bodies.

16.    During the same time period, JM knew and failed to disclose to these same facts to Plaintiff and the Class.  For the reasons described in Paragraphs 89 and 90 hereof, JM was legally obligated to disclose these facts to its potential customers.

17.    For example, it was widely known at JM that pipe stamped with the UL mark could not pass the Longitudinal Tensile Strength ("LTS") Test  required by UL because of problems with the materials from which the pipe was made and with the manufacturing process. The Corporate Quality Control Supervisor has stated that between 1997 and 2005, one hundred percent (100%) of the brand of pipe ("Blue Brute") purchased by Plaintiff failed the LTS Test.  The materials used in Blue Brute pipe and the process used to manufacture the pipe did not change materially after 2005.

18.    The allegation in this Complaint that JM produced or sold pipe which was "non-compliant" or did not meet specified standards means that JM sold pipe which did not comply with *all of the requirements* of the relevant listing or standards body.  Thus, for example, pipe which was not properly quality controlled as required by the relevant listing or certification body is included within the definition of "non-compliant" pipe because the quality control measures are an essential component of the standard.

19.    Because of JM's material misrepresentations and omissions described

THIRDAMENDED CLASS
ACTION COMPLAINT

above, and more fully described in Paragraphs 44 through 90 below, Plaintiff and the Class purchased and installed non-compliant PVC pipe in their properties which neither conforms to the representations made by JM nor meets the requirements of building codes or the market for PVC pipe.  But for such misrepresentations and omissions, Plaintiff and the Class would not have purchased JM pipe.  Plaintiff and the Class have suffered damage resulting from the purchase of JM's pipe, all as more fully alleged herein.

## II.    PARTIES

20.    Plaintiff is a California limited liability company with its principal place of business in Lancaster, California.  Plaintiff purchased JM Blue Brute (C900) PVC pipe in 2008.  The President of Plaintiff is also the President of the Board of Directors of the Antelope Valley-East Kern Water Agency ("AVEK").

21.    JM is a Delaware corporation with its principal place of business in Los Angeles, California.  During the relevant period, JM manufactured PVC pipe at five plants located in California and various other locations throughout the United States.  JM marketed and sold PVC pipe throughout the United States.

22.    Plaintiff is ignorant of the true names and capacities of the defendants sued herein as DOES 1-10 and therefore sues these defendants by such fictitious names.  Plaintiff will amend this complaint to allege their true names and capacities when they are ascertained.  Plaintiff is informed and believes and thereon alleges that each of the fictitiously named defendants is responsible in some manner for the occurrences herein alleged and that damages suffered by Plaintiff and the Class as herein alleged were proximately caused by their conduct.

23.    Plaintiff is informed and believes and thereon alleges that all defendants, including the fictitious Doe defendants 1 through 10, were at all relevant times acting as actual agents, conspirators, ostensible agents, partners, alter egos and/or joint venturers and employees of all other defendants and that all acts alleged herein occurred within the course and scope of that agency, employment,

THIRDAMENDED CLASS
ACTION COMPLAINT

partnership, alter ego, joint venture, conspiracy and/or enterprise, and with the express and/or implied permission, knowledge, consent, authorization and ratification of their co-defendants.

24.     Plaintiff is currently unaware of which individual person(s) employed by JM is responsible for each of the fraudulent acts and representations alleged herein to have been committed by JM as a corporate entity.  Plaintiff will amend this complaint to allege the identities of such persons when their identities are ascertained.

## III.   JURISDICTION AND VENUE

25.     This Court has original jurisdiction over this action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because there (i) are at least 100 class members in the proposed class, (ii) the combined claims of the proposed class members exceed $5,000,000 exclusive of interests and costs, and (iii) some class members and JM are citizens of different states.

26.     This Court has personal jurisdiction over JM in that JM has purposefully availed itself of the privilege of conducting business activities within California by manufacturing, warranting, advertising, and selling PVC pipe to Plaintiff and the Class, and has maintained systematic and continuous business contacts with California sufficient to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

27.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(a) because: (1) JM resides in this District and is subject to the exercise of personal jurisdiction herein; and (2) because a substantial part of the events, misrepresentations and/or omissions giving rise to Plaintiff's claims alleged herein occurred in this District.  In particular, both JM's principal place of business and the property in which Plaintiff installed JM pipe are located in this District.

## IV.   FACTUAL ALLEGATIONS

28.     Plaintiff is informed and believes that the allegations set forth in

- 6 -

THIRD AMENDED CLASS
ACTION COMPLAINT

Paragraphs 44 through 95 and 101 through 103 of this Complaint are true and correct and makes such allegations based on such information and belief.

### A.   Building Code Requirements

29.   There are two organizations which publish model plumbing codes which states can adopt.  Plumbing codes based on these model codes are in force in every state in the United States.

30.   The International Association of Plumbing and Mechanical Officials ("IAPMO") publishes the Uniform Plumbing Code ("UPC"). The UPC, which is enforced at the state or local level in 21 states, including California, specifies that: "All pipe, pipe fittings, traps, fixtures, material, and devices used in a plumbing system shall be listed or labeled (third-party certified) by a listing agency … and shall conform to approved applicable recognized standards referenced in this code." Where the UPC is in force, if a builder fails to install approved pipe, the project is "red tagged" and all work stopped.

31.   The International Code Council publishes the International Plumbing Code ("IPC"). The IPC, which is in force at the state or local level in 35 states, requires that PVC pipe must comply with designated standards and be tested by an independent agency. The IPC requires, "All plumbing products and materials shall comply with the referenced standards, specifications and performance criteria of this code and shall be identified in accordance with Section 303.1.  As relevant herein, the IPC model code requires that plumbing products and materials shall be either tested by an approved third-party testing agency or certified by an approved third-party certification agency."

32.   Both the IPC and UPC model codes state minimum standards for protection of the public health and safety.  For example, the IPC states:  "The purpose of this code is to provide minimum standards to safeguard life or limb, health, property and public welfare by regulating and controlling the design, construction, installation, quality of materials, location, operation and maintenance

THIRDAMENDED CLASS
ACTION COMPLAINT

1    or use of plumbing equipment and systems."

2          33.    In addition to these plumbing codes, other codes and statutes – such as

3    fire safety codes – contain certification or testing requirements for PVC pipe which

4    are relevant to the claims of Plaintiff and the Class herein.

5          **B.    Certifications and Standards Governing PVC Pipe**

6          34.    As stated, plumbing and other codes in force throughout the United

7    States require compliance with certification and/or testing standards.  Since

8    compliance with these codes is essential to obtaining building permits, construction

9    plans always specify the standards or certifications which PVC pipe must meet in

10   order to be used for a particular project.  For example, plans might specify the use

11   of "C900" pipe, referring to pipe meeting the C900 standard specified by the

12   American Water Works Association ("AWWA") or products which qualify for

13   listing by certification bodies such as UL.  Manufacturers most frequently represent

14   their compliance with these standards or listing criteria by stamping the pipe with

15   an appropriate label, such as "C900" or "UL Listed."

16         35.    The requirement that PVC pipe meet the standards specified in

17   building codes and building plans is universal.  If manufacturers of PVC pipe did

18   not warrant the compliance of their pipe with these standards, the manufacturers

19   could not sell PVC pipe for commercial applications at all.  PVC pipe which does

20   not meet these standards has no market value and could not be sold to owners or

21   developers at any price.  All persons who purchase PVC pipe for the uses

22   encompassed by this litigation rely upon the assertions of the manufacturers

23   concerning their compliance with such standards.

24         36.    The reason that PVC pipe standards are so important – and reliance by

25   purchasers and owners upon representations concerning those standards is universal

26   – is that PVC pipe is used in such vital activities as fire prevention, potable water

27   transmission and sewage disposal and must remain useful for the life of the system,

28   *i.e.*, for decades.  Water agencies who do not purchase pipe directly from

                                          THIRDAMENDED CLASS
                                          ACTION COMPLAINT

manufacturers – but ultimately own the pipe – rely on representations made by manufacturers such as JM concerning standards and certification because the consequences of owning non-compliant pipe – including its potential catastrophic failure – will ultimately be experienced by them and their users.  The pipe is installed underground and is located under roads, parking lots, hardscape, and landscaping, and is incorporated into the physical property, causing property damage to that property as a whole upon installation, and requiring destruction of that tangible property to accomplish removal or repair in the event of failure or replacement.  The defective pipe is inherently dangerous, as the failure of PVC pipe can lead to catastrophic consequences, including undermining of structures or other property, or injury or death to a bystander, and compromises water, sewage, and fire prevention systems.  In addition, PVC pipe meeting specified standards is required by uniform plumbing and building codes.  Compliance with these codes is necessary to pass building, public works, and fire inspections and to sell or insure the buildings in which such pipe is installed.  Conformance with these standards is so important that knowing failure to comply with them is a criminal offense in California.

37.    The principal organizations which certify that PVC pipe complies with their requirements are Underwriters Laboratories ("UL") and NSF International ("NSF").  Manufacturers of PVC pipe contract with these bodies for certification of their pipe.  Such pipe can only be sold as UL or NSF certified after it is tested and certified by them.

38.    The standards to which PVC pipe are tested are promulgated by, among others, UL, NSF, AWWA and The American Society for Testing and Materials ("ASTM").  The standards are created through a consensus process among the members and technical experts of the standards and certification bodies.

39.    UL has promulgated a quality standard governing PVC pipe used in underground fire protection systems.  UL Standard 1285 ("UL 1285") lists testing

THIRDAMENDED CLASS
ACTION COMPLAINT

requirements which must be met for PVC pipe to be UL certified. UL does not promulgate a standard for sewer or reclaimed water pipe.

40.     NSF promulgates two standards relevant to pipe sold by JM:  NSF Standard 14 ("NSF 14"), relating to the "materials, design, and construction" of pipe used for the transmission and distribution of water, and Standard 61 ("NSF 61") relating to the toxicity of pipe used for potable water.  NSF Standard 14 covers potable water, sewer and reclaimed water pipe.

41.     AWWA promulgates two relevant standards for PVC pipe: Standard C900 (for PVC pipe 4 to 12 inches in diameter) and Standard C905 (for diameters from 14 to 48 inches).  Almost all of the tests required by UL 1285 and NSF 14 are also required by C900 and C905.

42.     ASTM promulgates engineering testing standards, including standards for PVC pipe.  The most important ASTM standard relating to PVC pipe is ASTM D2241 which identifies the tests which PVC pipe must pass.  Among these tests are ASTM D2837 (hydrostatic design), ASTM D2152 (acetone-immersion) and ASTM D1784 (cell class testing). ASTM test procedures are also specified by UL 1285, AWWA C900 and C905, and NSF 14.

43.     As noted previously, building plans and plumbing codes typically specify that water pipe must satisfy one or more of the standards set by certification or standards bodies.  For example, plans might specify "C900," "C905" or "ASTM 2241" pipe.  At all relevant times, the products which are the subject of this action included pipe products whose name included the relevant standard, e.g. "Big Blue (AWWA C905)", "Blue Brute (AWWA C900)", "I.P.S. Pressure Pipe (ASTM D2241)", "P.I.P. Irrigation Pipe (ASTM D2241)", and "Solvent Weld (ASTM D2241)", and products which JM asserted met the standards specified by these bodies.

THIRD AMENDED CLASS
ACTION COMPLAINT

**C.**   **JM Misrepresentations Concerning Its Certifications and Compliance With Standards Governing PVC Pipe**

44.   Throughout the relevant time period, JM made numerous representations in promotional literature, on its website and by markings on its PVC pipe relating to the listing of its products and the conformance of its products with the tests and standards described previously.  By 1997, JM knew and failed to advise customers or standards bodies that the vast majority of the pipe it manufactured did not pass tensile strength and other tests specified by relevant standards and certification bodies and that the vast majority of the pipe it sold was not in fact in compliance with the certification requirements and standards relevant to the representations made by JM.

**2.**   **Misrepresentations Concerning Compliance With UL Standards and Certification**

45.   The use by JM of the UL mark constitutes a representation that it will ensure both compliance with UL's requirements and that it will conduct sufficient examinations and tests to ensure that the product meets UL's requirements.  UL's General Services Agreement provides:  "Client expressly agrees and warrants . . . that Client will, through proper inspection, examination, testing, and/or otherwise, periodically confirm that any of its Products that bear a Mark have been, and are being, manufactured in conformity with UL Requirements. Client further agrees that its use of the Mark constitutes Client's declaration and representation that Products bearing the Mark are covered by a UL Service and were manufactured in conformity with all applicable UL Requirements."

46.   The General Services Agreement expressly addresses the reliance by third parties, such as Plaintiff and members of the Class, on claims concerning the UL mark and their potential to mislead purchasers.  The GSA states: "Client acknowledges and agrees that the manufacture, sale, delivery, shipment, distribution, or promotion of any Product utilizing a Mark, or a description referring

THIRDAMENDED CLASS
ACTION COMPLAINT

to UL, could mislead third parties if such Product is not, in fact, covered by UL Service and/or does not comply with UL Requirements (including, without limitation, the applicable Standards or Procedure), and/or if the Marks are used in any way other than as provided in the Agreement and in the applicable Procedure."

47.    UL requires that manufacturers submit "representative samples of each type of PVC pipe" for qualification testing.  UL also specifies that pipe bearing the UL mark must be "identical to the subject models which were submitted to UL" to qualify the pipe.  If the manufacturer makes pipe which is not identical to the pipe submitted for listing, then the manufacturer is not entitled to represent that the pipe is UL listed or use the UL Mark on such pipe.

48.    JM represented that its Big Blue and Blue Brute PVC pipe qualified for the UL mark and complied with relevant provisions of UL 1285.  These representations were made by stamping the UL logo and "UL Listed" on the pipe and by other means such as product advertisements and brochures.  JM further represented that its Reclaimed Water (purple) and Forced Sewer (green) PVC pipe were manufactured to the same standard.

49.    JM's representation that its Big Blue and Blue Brute PVC pipe qualified for the UL mark and complied with relevant provisions of UL1285 was false and known by JM to be false.   JM stamped the UL mark on pipe which was not identical to the pipe that was qualified for listing and was thus not eligible to be stamped with that mark.  The changes made by JM to the pipe after listing included the substitution of lower viscosity resin, the substitution of inferior and lower cost waxes and stabilizers, increasing the extrusion speed, decreasing cooling time in the cooling baths, and a substitution of high output dies in the extrusion equipment in place of the original dies. JM made frequent changes to the formula and the manufacturing process with no notice to UL or any effort to qualify the new pipe through UL.

50.    The use by JM of the UL mark also constitutes a representation that it

THIRDAMENDED CLASS
ACTION COMPLAINT

was conducting sufficient examinations and tests to ensure that the product meets UL's requirements.  UL's General Services Agreement provides:  "Client expressly agrees and warrants . . . that Client will, through proper inspection, examination, testing, and/or otherwise, periodically confirm that any of its Products that bear a Mark have been, and are being, manufactured in conformity with UL Requirements. Client further agrees that its use of the Mark constitutes Client's declaration and representation that Products bearing the Mark are covered by a UL Service and were manufactured in conformity with all applicable UL Requirements."

51.    JM's representation that it was verifying by appropriate testing that its products complied with UL's standards was false and known by JM to be false.  For example, Section 17 of UL1285 requires that the LTS test performed on the pipe meet or exceed 7,000 psi.   Despite its representation that it was conducting tests to affirm compliance with this standard, JM did not conduct periodic LTS Tests following re-certification of its pipe in the mid-1990's when they started using the JM90 compound.  Moreover, the information it did possess convinced JM's former Corporate Quality Control Supervisor that one hundred percent (100%) of the pipe created by JM between 1997 and 2005 did not meet the longitudinal tensile strength standard required by UL 1285.

52.    Through 2004, the only available data on LTS results for most of the pipe was from testing done in connection with customer claims.  Claims data from 1997 to 2004 showed that 12 out of 14 samples tested failed the LTS test standards.

53.    Other data from the same period showed that JM's Big Blue pipe consistently failed to meet the UL standard.  Between 2001 and 2004 JM did LTS testing on 30" and 36" Big Blue in an attempt to gain UL listing for these pipe sizes.  A total of 97 samples were tested and all 97 came in below 7,000 psi, a 100% failure rate.  In 2005, in connection with the No Thickened Section project described in Paragraphs 55 through 60 below, JM conducted additional LTS tests

THIRDAMENDED CLASS
ACTION COMPLAINT

on 4" DR 18 and 4" DR 25 pipe from all 21 production facilities.  These tests showed that pipe produced at all of the facilities fell below the LTS minimum standard of 7,000 psi, with most in the 6,660 psi to 6,680 psi range.  JM conducted three additional rounds of testing on 4" DR 25 in 2006 which produced results in the range of 6,550 psi to 6,680 psi.

54.     Despite these test failures, JM's quality control personnel were told that the initial UL certification was sufficient to stamp the pipe with the UL mark and to ignore the test failures.

55.     In 2003, undertook a project to develop a new design for its C900 pipe (referred to as "No Thickened Section" pipe), using the same compound and processes used to manufacture the existing C900 PVC pipe.  JM knew that this pipe would have to be re-qualified with UL.

56.     It was determined that JM need only perform joint assembly, sustained pressure and hydrostatic pressure tests on the re-designed pipe.  Because of the changes JM had made to the formula used to produce the pipe and the changes it had made to speed production, JM knew that passing even this limited battery of tests would be difficult.

57.     In an effort to pass the UL tests, JM prepared non-representative test samples using a superior formula, slower extrusion speeds, better compound mixing and other techniques.  JM also pre-screened the samples by sending them to a private lab and terminating unfavorable tests, a practice JM hid from UL. Even though the samples submitted to UL for certification were superior to the PVC pipe actually produced and sold by JM, JM had great difficulty passing the tests.

58.     Despite these and other blatant violations of UL's rules, JM finally obtained UL's authorization to apply the UL Mark on the No Thickened Section pipe on May 19, 2005.  The Notice of Authorization to Apply UL Mark explicitly states, "Products that bear the UL Mark shall be identical to those that were evaluated by UL and found to comply with UL's requirements. If changes in

THIRDAMENDED CLASS
ACTION COMPLAINT

1   construction are discovered, appropriate action will be taken for products not in

2   conformance with UL's requirements and continued use of the UL Mark may be

3   withdrawn."

4       59.    Because JM managed to pass the UL tests only with non-

5   representative, specially-produced pipe, JM's quality control personnel urged that

6   future pipe be produced using the same formula and production methods as those

7   which produced the passing samples and that production of the pipe be limited to

8   those plants which had produced qualifying pipe.  These suggestions were rejected

9   by management and production was ordered to go forward at all facilities using the

10  same cheaper formulation and faster extrusion speeds that JM had previously used.

11      60.    Since obtaining UL listing for the No Thickened Section pipe, JM has

12  manufactured its pipe using this design and has falsely represented that the pipe is

13  approved by UL.  Because the pipe sold by JM is not identical to the pipe qualified

14  by UL, JM is not entitled to represent that the pipe is approved by UL.

15      61.    Like AWWA C900/905, UL 1285 requires that PVC pipe pass the

16  tests described in Paragraph 64 below. Therefore the failure of JM's products to

17  meet the standards described in Paragraphs 63 through 74 below relating to the

18  C900/905 standard also constituted a failure to meet the standards of UL 1285.

19      62.    JM's representation that its Reclaimed Water (purple) and Forced

20  Sewer (green) PVC pipe were manufactured to the same UL standard was also false

21  and known by JM to be false.  Because JM did not manufacture its Reclaimed

22  Water or Forced Sewer pipe differently than its Big Blue and Blue Brute pipe, its

23  failure to meet UL's requirements for Big Blue and Blue Brute pipe also constituted

24  a failure to meet the requirements of the UL standard for the Reclaimed Water and

25  Forced Sewer pipe.

26          **3.    Misrepresentations Concerning Compliance With**

27              **AWWA Standards**

28      63.    JM represented that its Big Blue and Blue Brute pipe complied with

- 15 -

THIRDAMENDED CLASS
ACTION COMPLAINT

the requirements of AWWA C900 (Blue Brute) and AWWA C905 (Big Blue).  JM further represented that its Reclaimed Water (purple) and Forced Sewer (green) PVC pipe complied with these requirements. (C900 for 4" to 12" pipe and C905 for 14" to 48" pipe).

64.     AWWA C900, AWWA C905 and ASTM D2241 require that PVC pipe pass certain specified tests, including without limitation (1) Cell Class Testing, (2) HDB Testing, (3) Sustained Pressure Testing, (4) Quick Burst Testing and (5) Acetone-Immersion Testing.  AWWA C900, AWWA C905 and ASTM D2241 all incorporate the requirements of ASTM D1784 cell class 12454.

65.     JM was able to obtain nominal compliance with cell class testing requirements of AWWA C900, AWWA 905 and ASTM D2241 only by using a different production method (compression molding) to produce test specimens than the method which it used in the ordinary run of production (extrusion). Compression molding generally yields higher tensile strength than extrusion.  The resulting artificial boost in tensile strength results allowed JM to conceal the fact that its actual tensile strengths are below the minimum 7,000 psi required by AWWA C900, AWWA C905 and ASTM D2241.  JM personnel have estimated that the actual tensile strength of pipe made with the JM90 formula was 6700 psi.

66.     Before 1997, compression molding was the only method by which samples could be prepared for cell class testing.  ASTM D1784 was amended in 1997 to allow extrusion and injection molded samples.  An Internal Memorandum dated May 5, 1997 states that JM's Director of Production was informed by representatives of ASTM that ASTM D20.15, the committee responsible for drafting ASTM D1784, "expressly stated their intent for these changes is to create the ability for manufacturers of extruded or injection molded products to have samples of materials for testing that are representative of the products which they are producing."  Despite the fact that compression molded samples were not representative of JM pipe, JM continued to test its samples using compression

THIRD AMENDED CLASS
ACTION COMPLAINT

1   molding.

2        67.    JM consistently produced pipe which failed the HDB testing

3   requirement of 4,000 psi.  For example, test results prior to June 2006 showed that

4   more than 50% of JM's test specimens failed this test. Despite these test results, JM

5   has never rejected a PVC pipe because it failed HDB testing.  JM also knew from

6   long experience and internal analysis that the Quick Burst Test results and HDB

7   test results were highly correlated.  Pipe which did not exceed 7,200 psi on the

8   Quick Burst test would fail HDB testing and the Sustained Pressure Test.

9        68.    As explained in an internal memo: "PVC pipe that fails at less than

10   7,200 psi hoop strength [Quick Burst Test] is poorly extruded.  All the sustained

11   pressure test failures and all the HDB (Hydrostatic Design Basis) test failures in

12   recent years involved pipe that gave quick-burst results of less than 7,200 psi hoop

13   strength." Similarly, an internal email stated: "Historically JM90 pipe that fails

14   ASTM D1599 at less than 7,200 psi hoop stress is questionable.  JM90 pipe that

15   fails ASTM at less than 7,000 psi hoop stress is BAD PIPE.  It will fail the

16   sustained pressure test."

17        69.    From 1997 through 2000, and from 2004 on, JM had an internal Quick

18   Burst standard of 6,400 psi, despite the fact JM knew this would result in

19   inadequate hoop strength under the HDB and Sustained Pressure tests.

20        70.    In addition, throughout the relevant time period, JM experienced

21   frequent failures of the Sustained Pressure Test or was able to pass the test only by:

22   (1) preparing samples using materials and processing conditions that were not

23   representative of its production pipe; and (2) cherry picking samples from lots that

24   had produced passing HDB test results.

25        71.    Similarly, during the same period of time, JM experienced frequent

26   failures of the 6,400 psi Quick Burst Test or was able to pass the test only by:

27   (1) preparing samples using materials and processing conditions that were not

28   representative of its production pipe; (2) cherry picking samples from lots that had

- 17 -

THIRD AMENDED CLASS
ACTION COMPLAINT

produced passing HDB and Sustained Pressure test results; (3) re-testing individual samples until they passed in violation of relevant AWWA and ASTM standards; and (4) calculating the results of the tests in a manner inconsistent with the requirements of the relevant ASTM standard so as to produce "passing" results which would not have been achieved if the test results had been analyzed correctly.

72.     JM samples routinely failed Acetone Immersion Tests (which tests the extrusion quality of PVC pipe) even though JM did the tests with acetone which was diluted by excess moisture in violation of the relevant ASTM standard.  Had JM conducted the tests as required by ASTM, many more samples would have failed.

73.     Section 5 of both AWWA C900 and AWWA C905 (titled "Verification") requires that the manufacturer "take adequate measures in the production of extruded PVC pipe…to ensure product compliance with the requirements of this standard."  By marking its pipe "C900" or "C905" and by stating in marketing materials that the pipe "Meets AWWA C900" and "Meets AWWA C905", JM warranted that it was taking "adequate measures" to "ensure product compliance with the requirements of" these standards.

74.     As detailed above, however, JM not only failed to take "adequate measures" to assure compliance with AWWA C900 and AWWA C905, it knowingly continued to make pipe which consistently failed to meet the standards.

**4.     Misrepresentations Concerning Compliance With ASTM Standards**

75.     JM represented that its I.P.S. Pressure, and certain of its P.I.P. Irrigation and Solvent Weld PVC Pipe (referred to herein as "D2241 pipe") conformed to ASTM D2241, NSF Standard 14 and NSF Standard 61 and that the PVC compounds used in the extrusion of this pipe met or exceeded the requirements of ASTM D1784 cell class 12454.

76.     For the reasons detailed in Paragraphs 64 through 74 above, the

- 18 -

THIRD AMENDED CLASS ACTION COMPLAINT

1    failure of JM to meet the standards set forth in AWWA C900 and AWWA C905

2    also resulted in its failure to meet the requirements of ASTM D2241 for pipe

3    alleged to meet this standard.

4        77.    Paragraph 11 of ASTM D2241 provides: "When the product is marked

5    with this designation, D2241, the manufacturer affirms that the product was

6    manufactured, inspected, sampled, and tested in accordance with this specification

7    and has been found to meet the requirements of this specification."

8        78.    JM's representations that its D2241 pipe "was manufactured,

9    inspected, sampled, and tested in accordance with this specification" was also false

10   because the pipe had not been manufactured, inspected or tested in accordance with

11   ASTM D2241.  JM knew that its D2241 pipe could not pass numerous tests

12   required by ASTM D2241.  Further, JM's continual modification of the formula

13   used in its D2241 pipe to substitute cheaper ingredients and changes to speed-up

14   production, without testing the modifications to determine compliance with all the

15   requirements of the standard meant that JM had no basis for its claim that its pipe

16   satisfied the ASTM D2441 standard.

17        **5.    Misrepresentations Concerning Compliance With**

18             **NSF Certification and Standards**

19        79.    NSF requires that PVC pipe provided to NSF for certification testing

20   be "representative" of the pipe produced by the manufacturer.  This means that pipe

21   submitted for testing must be made using the same materials and the same

22   production process, and must be produced in the same quantities as the ordinary run

23   of production.  The submission for testing of non-representative samples violates

24   NSF guidelines generally and NSF Standard 14 specifically.  Further, once NSF

25   authorizes a manufacturer to designate a product as complying with a particular

26   NSF standard, the manufacturer may designate a commercial product as complying

27   with that standard only if the commercial product is manufactured using the same

28   formulation and the same process that was used to produce the tested samples.

THIRDAMENDED CLASS
ACTION COMPLAINT

80.     While JM had an ostensible NSF 14 certification for some of its products, including ASTM D2241, when JM changed the compound used to manufacture D2241 pipe, and changed production processes as discussed above, it never submitted D2241 pipe samples manufactured using the new materials for testing, violating NSF certification standards.  JM nevertheless represented that its D2241 pipe complied with NSF 14 by stamping the pipe with either an "NSF 14" or an "NSF PW" designation.

81.     In approximately August 2003, when NSF discovered that JM changed the materials used in its PVC compound, and was stamping its D2241 pipe with NSF certification markings despite the fact that the pipe produced with a new wax compound (A28) had not been submitted for certification under NSF 14, NSF blocked the sale of millions of pounds of D2241 pipe.  NSF required JM to submit samples of each size of D2241 pipe containing the new additive for testing.

82.     Although JM knew that the pre-testing and pre-selection of non-representative samples violated NSF standards, JM repeatedly submitted D2241 pipe samples which were selected in a non-representative manner, and pre-tested portions of such samples to identify pipe segments and lots that would be more likely to pass the tests.  JM even dispatched its Corporate Quality Control Supervisor and others to the plant to personally oversee the selection of PVC samples for submission to NSF.  Over a period of almost one year and, after many failed internal tests, JM was able to obtain NSF approval for the release of most sizes of its ASTM 2241 pipe.

83.     All of these approvals were obtained by submitting non-representative pre-selected and often pre-tested samples to NSF, in violation of NSF's rules.  JM knew, and failed to inform NSF, that it had obtained certification of this pipe in violation of NSF's standards and that its internal tests reflected that much of the pipe was of inferior quality and would not have passed NSF testing.

84.     At the time NSF blocked the sale of D2241 pipe, it also blocked the

THIRDAMENDED CLASS
ACTION COMPLAINT

1  sale of millions of pounds of C900 pipe which was also manufactured from the new
2  compound which was not qualified for listing.  However, JM requested that NSF
3  release the C900 pipe and allow it to be sold because the C900 pipe is not subject to
4  NSF 14 requirements. JM's C900 pipe refers only to NSF 61, and the A28 wax was
5  qualified for NSF 61 purposes.  As a result, JM contended that NSF had no
6  authority to hold the product, and on August 7, 2003, with NSF's consent, JM
7  released 1.5 million pounds of the C900 pipe for sale, despite knowing from its
8  internal investigation and testing that the C900 pipe did not conform to basic
9  industry standards.

10       85.    NSF 14 specifies that:  "A Quality Control program shall be operated
11  and maintained to ensure that products conform to the applicable requirements of
12  this Standard on a continuous basis."  Accordingly, by claiming compliance with
13  the NSF 14 standard, JM represented that it had in place a quality control program
14  sufficient to ensure its compliance with NSF 14 on a continuous basis.

15       86.    JM knew that its D2241 pipe could not pass numerous tests required
16  by NSF 14.  Further, JM's continual modification of the formula used in its D2241
17  pipe to substitute cheaper ingredients and changes to speed-up production, without
18  testing the modifications to determine compliance with all the requirements of the
19  standard meant that JM had no basis for its claim that its pipe satisfied the NSF 14
20  standard.

### 6.    Misrepresentations Concerning Compliance With Quality Control Standards

23       87.    As described previously, each of the standards with which JM claimed
24  to comply has one or more requirements that manufacturers take steps to ensure
25  their continuous compliance with any standard the manufacturer claims to meet.
26  Despite claiming to meet each of these standards, JM did not maintain an adequate
27  quality control program to ensure compliance with the relevant standards. In
28  addition to the failures alleged previously, JM failed to provide all of its plants with

THIRDAMENDED CLASS
ACTION COMPLAINT

appropriate equipment for testing, enforced quotas for production which left inadequate time to conduct testing, failed to give quality control personnel adequate authority to enforce decisions about non-compliant pipe (repeatedly resulting in plant management overriding quality control decisions to "red-tag" pipe and selling such pipe), instructed quality control personnel to falsify test and inspection records, knowingly provided management with financial incentives to override quality control recommendations, and refused to alter production methods or formulation despite the fact that pipe consistently failed to meet even the minimum standards.

88.     JM's failure to meet the relevant standards was the result of JM's replacement of industry-standard plastic resin formulas with inferior ingredients supplied by an affiliated company (Formosa Plastics Corporation ("Formosa")), excessively high production rates and improper tooling and maintenance of the extruders used in the manufacture of the pipe.  By no later than 1997, JM had received internal test results and test results from its customers showing that more than 50 percent of JM's PVC pipe failed to meet strength requirements specified by the standards bodies.

**D.     JM Failure to Disclose Material Facts Concerning Its Certifications and Compliance With Standards Governing PVC Pipe**

89.     In addition to misrepresenting affirmatively the compliance of its PVC pipe products with relevant standards, JM actively concealed from Plaintiff and the Class information essential to the Class such as, for example: (1) internal test results showing that its PVC pipe failed to meet the standards JM claimed to meet; (2) that JM had obtained ostensible certification of its products only by pre-selecting, pre-testing and "cherry picking" non-representative samples of those products; (3) JM's violation of the rules of UL and NSF for the submission of test samples and the listing of tested products; and (4) JM's receipt of warnings from its

THIRDAMENDED CLASS
ACTION COMPLAINT

own employees and representatives of standards bodies concerning the quality of its products.    Each of these material non-disclosures is detailed more fully in Paragraphs 44 through 88 above.

90.    JM was obligated to disclose these facts to Plaintiff and the Class because such disclosure was necessary to qualify affirmative representations made concerning JM's PVC pipe and to make such representations non-misleading. Thus, for example, JM's failure to inform Plaintiff and the Class that it obtained ostensible certification of its PVC pipe by providing standards bodies with non-representative samples of its PVC pipe made its affirmative representations about the listing of its PVC pipe by such bodies materially misleading.  Similarly, JM's failure to inform Plaintiff and the Class that it based its claim of standard qualification on the same such tests using non-representative samples, and that it never subjected the pipe to new rounds of testing after making material changes to the formulation  and production made its affirmative representations about the conformance to standards materially misleading.  Disclosure of the facts JM failed to disclose was also necessary because JM was uniquely in possession of the facts it did not disclose, knew that such facts were not available to Plaintiff and the Class, and knew that such facts would be highly material to any prospective purchaser of its products.

### E.    Facts Concerning the Targets of JM's Representations

91.    JM understands and intends that its PVC pipe will be installed in properties owned by persons or entities who must comply with plumbing and building codes administered by government entities.  JM markets it products to such government entities for the purpose of convincing those government entities to permit JM pipe to be installed in the water and sewer systems under the control of such government entities.

92.    JM is familiar with the specifications required by government entities for accepting PVC pipe into water and sewer systems and represents that its PVC

THIRDAMENDED CLASS
ACTION COMPLAINT

pipe meets those specifications for the purpose of convincing those government entities to authorize the purchase or acquisition of JM pipe.  Unless JM made such representations to such government entities it could not sell it products because all owners of properties in which such pipe is installed must comply with the requirements of such government entities.

93.    JM most often sells its pipe to initial purchasers who are not intended to be the ultimate owners of the PVC pipe (the "Initial Purchasers").  The PVC pipe products purchased by the Initial Purchasers are ultimately installed in properties owned or constructed by persons or entities other than the Initial Purchasers.

94.    JM and the Initial Purchasers intended that all representations made by JM concerning the pipe – including representations concerning the listing of such products and the compliance of products standards stated by standards bodies  – would be conveyed to and relied upon by the ultimate owners of the pipe.  JM and the Initial Purchasers also intended that express and implied warranties concerning the pipe made by JM were for the benefit of owners of the pipe such as Plaintiff and Class Members.

95.    JM contracted with the Initial Purchasers to supply PVC pipe to be installed in Plaintiff's and Class Members' properties and knew that the Initial Purchasers would not generally own or occupy such properties. Express and implied warranties made by JM concerning its products would be of no economic value to the Initial Purchasers unless the ultimate owner of the properties in which JM's pipe is installed – Plaintiff and Class Members – received the benefit of such warranties.

F.    **Facts Concerning Plaintiff's Individual Case**

96.    In 2008, Plaintiff constructed a commercial building on the property commonly known as 43645 Pioneer Court, Lancaster, California (the "Project").

97.    Plaintiff installed fire protection systems at the Project consisting of the building fire sprinkler system and the fire hydrant system.  In connection

- 24 -

THIRDAMENDED CLASS
ACTION COMPLAINT

therewith, Plaintiff, through its utility subcontractor, purchased and installed hundreds of feet of JM Blue Brute (C900) PVC pipe including:

      a.    6" C900 DR18 CL150 Pipe (approximately 190 feet);

      b.    8" C900 DR18 CL150 Pipe (approximately 170 feet);

      c.    10" C900 DR18 CL150 Pipe (approximately 270 feet);

      d.    12" C900 DR18 CL150 Pipe (approximately 70 feet).

      98.    Plaintiff's utility subcontractor purchased the PVC pipe from HD Supply Waterworks ("HD Supply"), a distributor of JM PVC pipe. All of the JM PVC pipe purchased by Plaintiff's utility subcontractor was stamped with the UL Mark, AWWA C900, NSF 61 and the pipe pressure class.

      99.    When Plaintiff's subcontractor purchased the JM pipe, it saw and reasonably relied upon the marks affixed to the JM PVC pipe indicating that the PVC pipe purchased for the Project met industry standards. Had JM not represented that the pipe was UL listed and met the other standards specified on the pipe, Plaintiff and its subcontractor would not have purchased the pipe. The president of Cambridge is intimately familiar with the requirements for PVC pipe. He would not have permitted any pipe to be installed at the Project if he was not certain that the particular pipe installed at the Project clearly and certainly represented to have met the standards specified by JM. Similarly, had Plaintiff's president been aware of the facts which JM did not disclose, all as more fully set forth in Paragraph 89 hereof, he would not have authorized the purchase of JM pipe.

      100.   As a proximate result of its reliance on JM's representations and the falsity of those representations, Plaintiff has suffered actual loss, all as more fully set forth in Paragraphs 104 and 105 hereof.

## V.    <u>STATUTES OF LIMITATION</u>

      101.   JM's misrepresentations concerning the use of the listing marks and its compliance with relevant standards and its concealment of the facts described in

THIRDAMENDED CLASS
ACTION COMPLAINT

Paragraphs 44 through 88 hereof were not and could not have been known to Plaintiff and the Class.  Plaintiff and the Class did not become aware of issues related to JM PVC pipe any earlier than the date on which the complaint in *S. ex rel Hendrix v. JM Manufacturing*, Case No. ED CV06-00055-GW (C.D. Cal.) ("*Hendrix*"), was unsealed and its allegations made public on or about February 8, 2010.

102.   Any applicable statutes of limitation on the claims asserted by Plaintiff and the Class have been tolled by JM's misrepresentations and active concealment of the facts alleged herein.  Plaintiff and the Class have been kept ignorant by JM of vital information essential to the pursuit of these claims, without any fault or lack of diligence on their part.  Plaintiff and the Class could not reasonably have discovered the facts JM misrepresented and concealed, or its failure to comply with industry standards.

103.   JM is estopped from relying on any statutes of limitation in defense of this action.  JM affirmatively misrepresented and actively concealed the true character, quality, and nature of the PVC pipe and, for the reasons described in Paragraph 134 below, JM was under a continuous duty to disclose to Plaintiff and the Class the facts it misrepresented and omitted to disclose.  Plaintiff and the Class reasonably relied upon JM's misrepresentations and active concealment in failing to press the claims asserted herein.

## VI.   DAMAGE ALLEGATIONS AND MEASURES OF RESTITUTION

104.   As a result of the actions of JM as heretofore alleged, Plaintiff and the Class have suffered loss including, without limitation:

   a.   The difference in market value between pipe meeting listing and testing standards claimed by JM and pipe which did not meet those standards; Plaintiff alleges that this difference is the full price of the JM pipe;

   b.   The cost of removing pipe installed by Plaintiff and the Class and the installation of replacement pipe; these amounts are necessary both to return

- 26 -

THIRDAMENDED CLASS
ACTION COMPLAINT

1   Plaintiff and the Class to the position they would have enjoyed had they not

2   purchased JM pipe in reliance on the representations made by JM and to fund

3   reasonable remedial efforts to avoid the risk of catastrophic failure of the pipe and

4   resultant injury to person and property;

5              c.     The amount of the additional cost of ownership and maintenance

6   of the properties under which the pipe is installed arising from lack of assurance

7   that JM pipe can reliably meet the standards relevant for PVC pipe used in

8   municipal and private water systems including, without limitation, the cost of

9   insuring the property against risks arising from the installation of JM pipe, the cost

10   of investigating actual or potential catastrophic failures of the pipe and other similar

11   costs;

12              d.     The amount of the decline in the market value of properties

13   under which JM pipe has been installed including, without limitation, any decline in

14   value caused by the stigma associated with the presence of JM pipe under the

15   property;

16              e.     The cost of repairing damage proximately caused by failure of

17   the pipe and compensating any third parties for damages suffered by them for

18   which the owner of the pipe is responsible and of replacing the failed pipe;

19              f.     The value of claims lost by owners against developers or other

20   parties and/or claims arising from the surrender or release of performance and other

21   bonds issued in connection with the development of the property under which the

22   JM pipe was installed which claims would have been made and recovered by the

23   parties benefited thereby had the persons or entities entitled to payment of the

24   claims or performance under the bonds been aware of the facts misrepresented and

25   concealed by JM; and

26              g.     Other amounts, according to proof.

27       105.   In addition, or as an alternative to the amounts described above,

28   Plaintiff and the Class are entitled to an order requiring JM to disgorge the profit

THIRDAMENDED CLASS
ACTION COMPLAINT

1   made by JM as a result of the conduct alleged herein, in an amount according to
2   proof.

3   **VII.   CLASS ACTION ALLEGATIONS**

4   106.   The Class which Plaintiff seeks to represent in this action is defined as
5   follows:

6   "All persons and entities who own installed PVC pipe manufactured
7   by JM under the brand names listed in Exhibit "1" hereto which was
8   purchased by such persons or entities, or their agents, between
9   January 1, 1997 and the present.  The Class includes governmental
10   entities (such as municipal water districts) who own such pipe as a
11   result of transfers from third parties in connection with the
12   development of real property under the jurisdiction of such
13   governmental entities.  Excluded from the Class are the United States,
14   the States of California, Delaware, Florida, Illinois, Indiana, Nevada,
15   New Mexico, New York, and Tennessee, the Commonwealths of
16   Massachusetts and Virginia, the District of Columbia, and the political
17   subdivisions and public water and sewer agencies thereof."

18   Plaintiff reserves the right to modify or amend the Class definition, as appropriate.

19   107.   Certification of Plaintiff's claims for class wide treatment is
20   appropriate because Plaintiff can prove the elements of its claims on a class-wide
21   basis and because this case meets the requirements of Federal Rule of Civil
22   Procedure 23.

23   108.   **Numerosity (Rule 23(a)(1)).**  The members of the Class are so
24   numerous that individual joinder of all the members is impracticable.  Plaintiff is
25   informed and believes, and thereon alleges, that there are at least thousands of
26   purchasers who have been damaged by the conduct alleged herein.

27   109.   **Commonality and Predominance (Rule 23(a)(2) and (b)(3)).**  This
28   action involves common questions of law and fact which predominate over any

THIRD AMENDED CLASS
ACTION COMPLAINT

questions affecting individual class members including, without limitation, the following:

a.      Whether JM violated California's Unfair Competition Law, Bus. & Prof. Code § 17200, *et seq*., by, among other things, engaging in unfair, unlawful, or fraudulent practices;

b.      Whether JM violated California's Unfair Competition Law, Bus. & Prof. Code § 17200, *et seq.*, and/or False Advertising Law, Bus. & Prof. Code § 17500, *et seq*., by, among other things, falsely advertising that its PVC pipe products meet industry standards when they, in fact, do not meet such standards;

c.      Whether JM has been unjustly enriched as a result of the conduct complained of herein;

d.      Whether Plaintiff and the Class are entitled to equitable relief, including but not limited to restitution.

e.      Whether JM falsely represented that its PVC pipe products met certain industry standards that such products did not, in fact meet;

f.      Whether JM knew or should have known that its PVC pipe products failed to meet relevant industry standards;

g.      Whether JM concealed material information regarding the nature and quality of its PVC pipe products which it was under a duty to disclose;

h.      Whether JM's false representations and concealment of information regarding its PVC pipe products were intentional;

i.      Whether JM breached its express warranties to Plaintiff and the Class;

j.      Whether JM breached its implied warranties to Plaintiff and the Class; and

k.      Whether Plaintiff and the Class are entitled to actual, statutory, punitive, exemplary damages or other monetary relief and, if so, in what amount.

110.    **Typicality (Rule 23(a)(3)).** Plaintiff's claims are typical of the claims

THIRDAMENDED CLASS
ACTION COMPLAINT

1   of the Class because Plaintiff, like all Class members, procured JM pipe because of

2   the intentional misrepresentations and omissions of JM and was damaged as a

3   result.

4        111.  **Adequacy of Representation (Rule 23(a)(4)).**  Plaintiff is an

5   adequate representative of the Class because its interests do not conflict with the

6   interests of the Class, it has retained counsel competent and experienced in complex

7   class action litigation and it intends to prosecute this action vigorously.  The

8   interests of the Class will be fairly and adequately protected by Plaintiff and its

9   counsel.  Plaintiff is an adequate representative for both public and private entities

10  because its principal is both the chief executive of a private entity and the President

11  of the Board of Directors of a public water agency.  Accordingly, Plaintiff is fully

12  familiar with the interests of both public and private entities and can represent those

13  interests adequately.

14       112.  **Superiority (Rule 23(b)(3)).**  A class action is superior to all other

15  available means for the fair and efficient adjudication of this controversy in that:

16       a.  The prosecution of separate actions by individual members of

17  the Class would create a foreseeable risk of inconsistent or varying adjudications

18  which would establish incompatible results and standards for JM;

19       b.  Adjudications with respect to individual members of the Class

20  would, as a practical matter, be dispositive of the interests of the other members not

21  parties to the individual adjudications or would substantially impair or impede their

22  ability to protect their own separate interests;

23       c.  Class action treatment avoids the waste and duplication inherent

24  in potentially thousands of individual actions, and conserves the resources of the

25  courts; and

26       d.  The claims of individual Class members are not large when

27  compared to the cost required to litigate such claims.  Accordingly, it would be

28  impracticable for the members of the Class to seek individual redress for JM's

THIRDAMENDED CLASS
ACTION COMPLAINT

1   wrongful conduct.  The class action device provides the benefits of single

2   adjudication, economies of scale, and comprehensive supervision by a single court.

3   The case presents no significant management difficulties which outweigh these

4   benefits.

5        113.   **Class Notice (Central District Local Rule 23-2.2(g)).**   Plaintiff

6   cannot be certain of the form and manner of class notice it will propose until the

7   class is finally defined and some discovery concerning the identity of Class

8   members is undertaken.  Based on the experience of its counsel in previous cases,

9   however, Plaintiff anticipates that notice by mail will be given to all Class members

10   who can be identified specifically and that this notice will be supplemented by

11   notice published in appropriate periodicals, notice published on the Internet and by

12   press releases and similar communications to relevant industry and trade groups.

13   **VIII.   <u>CLAIMS FOR RELIEF</u>**

14   **<u>FIRST CLAIM FOR RELIEF</u>**

15   **(Violation of California Business & Professions Code § 17200, *et seq.*)**

16        114.   Plaintiff incorporates by reference each allegation set forth in the

17   preceding paragraphs.

18        115.   JM's misrepresentations and omissions, as alleged herein, constitute

19   deceptive, unfair, fraudulent and unlawful practices committed in violation of the

20   Bus. & Prof. Code § 17200, *et seq.* ("UCL").

21        116.   All of the conduct and misrepresentations and omissions alleged herein

22   occurred in the course of JM's business and were part of a pattern or generalized

23   course of conduct.

24        117.   The deceptive, unfair, fraudulent, and unlawful conduct alleged herein

25   was specifically designed to and did induce Plaintiff and the Class to purchase or

26   install JM's PVC pipe in their properties.

27        118.   Plaintiff and the Class reasonably and justifiably relied on JM's

28   deceptive, unfair, fraudulent, and unlawful conduct alleged herein in making the

THIRDAMENDED CLASS
ACTION COMPLAINT

decision to purchase or install JM's PVC pipe in their properties.

119.   Plaintiff and the Class have suffered injury-in-fact, lost money, and lost property because Plaintiff and the Class would not have purchased or installed JM PVC pipe in their properties but for JM's misrepresentations and omissions concerning its PVC pipe.

120.   Pursuant to Bus. & Prof. Code § 17203, Plaintiff and the Class seek to recover from JM restitution and disgorgement of earnings, profits, compensation and benefit obtained as a result of the practices that are unlawful under Bus. & Prof. Code § 17200 *et seq.*, according to proof.

121.   The unfair and fraudulent business practices of JM described herein are likely to continue and therefore will continue to mislead the public and present a continuing threat to the public.  Plaintiffs therefore request a permanent injunction as set forth in the Prayer for Relief below.

## SECOND CLAIM FOR RELIEF

### (Violation of Business & Professions Code § 17500, *et seq.*)

122.   Plaintiff incorporates by reference each allegation set forth in the preceding paragraphs.

123.   Business & Professions Code § 17500, *et seq.* (the "FAL") provides, in pertinent part:

> "It is unlawful for any…corporation…with intent directly or indirectly
> to dispose of real or personal property…or anything of any nature
> whatsoever or to induce the public to enter into any obligation relating
> thereto, to make or disseminate or cause to be made or disseminated
> before the public in this state, or to make or disseminate or cause to be
> made or disseminated from this state before the public in any state, in
> any newspaper or other publication, or any advertising device, …any
> statement, concerning that real or personal property…or concerning
> any   circumstance   or   matter   of   fact   connected   with   the

THIRDAMENDED CLASS
ACTION COMPLAINT

proposed…disposition thereof, which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading…or …to so make or disseminate or cause to be so made or disseminated any such statement as part of a plan or scheme with the intent not to sell that personal property …so advertised…as so advertised."

124.   JM violated the FAL by knowingly disseminating unfair, deceptive, untrue and/or misleading marketing, advertising and other broadly disseminated representations that its PVC pipe met UL, AWWA, NSF and ASTM standards when in fact, it did not.

125.   As a result of JM's violations of the FAL, Plaintiff and the Class have suffered injury-in-fact, lost money, and lost property, and JM has been unjustly enriched by their receipt of monies from Plaintiff and the Class who purchased JM PVC pipe which was sold or installed based on advertising and marketing materials which materially misrepresent the compliance of JM's product with relevant industry standards.  But for these misrepresentations, Plaintiff and the Class would not have purchased or installed JM PVC pipe.

126.   Pursuant to Bus. & Prof. Code § 17535, Plaintiff and the Class seek to recover from JM restitution and disgorgement of earnings, profits, compensation and benefit obtained as a result of the practices that are unlawful under Bus. & Prof. Code § 17500 *et seq.*, according to proof.

### **THIRD CLAIM FOR RELIEF**

### **(Unjust Enrichment/Restitution)**

127.   Plaintiff incorporates by reference each allegation set forth in the preceding paragraphs.

128.   To the detriment of Plaintiff and the Class, JM has been unjustly enriched as a result of the unlawful and/or wrongful collection of, *inter alia*, payments for non-compliant JM PVC pipe.

- 33 -

THIRD AMENDED CLASS
ACTION COMPLAINT

129.   It would be inequitable and unjust for JM to retain any profits, benefits, or other money it obtained from their wrongful conduct.

130.   Accordingly, Plaintiff and the Class seek full restitution of JM's enrichment, benefits, and ill-gotten gains acquired as a result of JM's unfair, fraudulent, and unlawful conduct alleged herein, according to proof.  Included in these amounts are any amounts required to return Plaintiff and the Class to the positions they would have enjoyed but for the conduct of JM alleged herein, including the sums specified in Paragraph 104 herein.

## FOURTH CLAIM FOR RELIEF

### (Fraud/Deceit)

131.   Plaintiff incorporates by reference each allegation set forth in the preceding paragraphs.

132.   JM knowingly made the misrepresentations to Plaintiff and the Class specified in Paragraphs 44 through 88 of this Complaint.  These representations related to the basic properties of the PVC pipe and were highly material for the reasons stated in Paragraphs 35 and 36 hereof.

133.   JM knowingly concealed and intentionally failed to disclose to Plaintiff and the Class the facts described in Paragraphs 89 and 90 hereof.  This information was material to Plaintiff and the Class and was concealed by JM to induce Plaintiff and the Class to install JM's PVC pipe.

134.   At all relevant times, JM had exclusive knowledge of material facts not known to Plaintiff and the Class, actively concealed these facts from the Plaintiff and the Class, and made representations concerning its certification and compliance with industry standards which were materially misleading in light of the facts it suppressed.

135.   JM intended for Plaintiff and the Class to rely on its representations and omissions regarding the quality of the PVC pipe.  JM knew that in the absence of such representations and omissions, Plaintiff and the Class would not become

- 34 -

THIRDAMENDED CLASS
ACTION COMPLAINT

1    owners of JM's PVC pipe.

2        136.   Plaintiff and the Class were unaware of and reasonably relied on JM's

3    misrepresentations and omissions regarding its PVC pipe.  Had Plaintiff and the

4    Class been aware of the misrepresentations and omissions of JM concerning its

5    PVC pipe, they would not have allowed PVC pipe sold by JM to be installed on

6    their properties.

7        137.   As a proximate result of JM's material misrepresentations and

8    omissions alleged herein, Plaintiff and the Class were damaged in an amount to be

9    proven at trial.

10                        **FIFTH CLAIM FOR RELIEF**

11                        **(Negligent Misrepresentation)**

12       138.   Plaintiff incorporates by reference each allegation set forth in the

13   preceding paragraphs.

14       139.   JM made the misrepresentations to Plaintiff and the Class specified in

15   Paragraphs 44 through 88 of this Complaint without reasonable ground for

16   believing the representations to be true.  These representations related to the basic

17   properties of the PVC pipe and were highly material for the reasons stated in

18   Paragraphs 35 and 36 hereof.

19       140.   In addition, JM omitted and failed to disclose to Plaintiff and the Class

20   the facts described in Paragraphs 89 and 90 hereof.  These omissions and failures to

21   disclose rendered express representations made by JM concerning its products

22   likely to mislead.  The information JM omitted and failed to disclose was material

23   to Plaintiff and the Class and JM's failure to disclose such information mislead

24   Plaintiff and the Class concerning JM's products.

25       141.   JM intended to induce Plaintiff and the Class to rely on its

26   representations and misleading statements regarding the quality of the PVC pipe.

27   JM knew that in the absence of such representations and misleading statements,

28   Plaintiff and the Class would not become owners of JM's PVC pipe.

THIRDAMENDED CLASS
ACTION COMPLAINT

142.   Plaintiff and the Class were unaware of and reasonably relied on JM's misrepresentations and misleading statements regarding its PVC pipe.  Had Plaintiff and the Class been aware of the misrepresentations and misleading statements of JM concerning its PVC pipe, they would not have allowed PVC pipe sold by JM to be installed on their properties.

143.   As a proximate result of JM's material misrepresentations and misleading statements alleged herein, Plaintiff and the Class were damaged in an amount to be proven at trial.

## SIXTH CLAIM FOR RELIEF
### (Breach of Express Warranty)

144.   Plaintiff incorporates by reference each allegation set forth in the preceding paragraphs.

145.   In order to promote and induce the purchase of its products, JM expressly warranted to Plaintiff and the Class, by advertisement, literature, pipe specifications stamped on the pipe, including certification marks, and other means, that the JM PVC pipe products were merchantable, met relevant industry standards, and were fit for the ordinary purpose for which such products were sold.  As set forth herein, the express warranties were intended to represent and were understood by Plaintiff and the Class to represent that all of JM's products complied with the relevant standards and that JM had taken the steps necessary to ensure the compliance of its products with the relevant standards.

146.   These express warranties formed part of the basis of the bargain between JM, on one hand, and Plaintiff and the Class, on the other.

147.   JM breached its express warranties by manufacturing and selling PVC pipe products that were: (1) not manufactured to industry standards or the specifications referenced on the products; (2) not of merchantable quality; and (3) unfit for their intended use.

148.   As a result of JM's breaches of its express warranties, Plaintiff and the

THIRDAMENDED CLASS
ACTION COMPLAINT

1    Class have been damaged in an amount to be proven at trial.

2         149.   JM received timely notice of the breach of warranty alleged herein by

3    reason of its own knowledge of the non-compliant PVC pipe, the assertion by Class

4    members of claims, by the *Hendrix* complaint and this Complaint.

5         150.   By reason of the foregoing, Plaintiff, on behalf of itself and all others

6    similarly situated, demands judgment against JM for damages, including

7    compensatory, incidental and consequential damages (excepting damages for

8    personal injuries) for itself and each member of the Class.

9                        **SEVENTH CLAIM FOR RELIEF**

10                       **(Breach of Implied Warranty)**

11        151.   Plaintiff incorporates by reference each allegation set forth in the

12   preceding paragraphs.

13        152.   The sale of PVC pipe between JM and the Initial Purchasers included

14   warranties implied in the law that JM's PVC pipe products were merchantable, met

15   industry standards, and were fit for the purpose for which such products were sold

16   (the "Implied Warranties").

17        153.   JM breached the Implied Warranties by manufacturing and selling

18   PVC pipe products that were not of merchantable quality, did not meet industry

19   standards and were unfit for their intended use.

20        154.   As a direct and proximate result of JM's breach of the Implied

21   Warranties, Plaintiff and the Class have been damaged in an amount to be proven at

22   trial.

23   **IX.    ALTERNATIVE CLAIM FOR RESCISSION AND RESTITUTION**

24        155.   As an alternative to the claims for damages set forth in the Fourth

25   though Seventh Claims for Relief herein, Plaintiff and the Class pray for rescission

26   of the contract for the sale of the pipe by JM to Plaintiff and the Class and the

27   restitution by JM of all benefits conferred upon it by Plaintiff and the Class and

28   such additional amounts as are necessary to restore Plaintiff and the Class to the

THIRDAMENDED CLASS
ACTION COMPLAINT

1    position they would have enjoyed but for the conduct therein alleged.

2        156.   Plaintiff and the Class base their request for rescission and restitution

3    upon the fraud and deceit of JM alleged in the Fourth Claim for Relief and the

4    complete failure of consideration proffered by JM as a result of the breach of the

5    warranties alleged in the Sixth and Seventh Claims for Relief.

6        157.   Plaintiff and the Class intend that service of this Complaint upon JM

7    constitute their notice of their intent to rescind the contracts for the sale of the pipe

8    and as a demand for restoration of the consideration they paid to JM, plus

9    additional amounts necessary to restore Plaintiff and the Class to the position they

10   would have enjoyed in the absence of the conduct alleged in the Fourth through

11   Seventh Claims for Relief.  These additional amounts include, without limitation,

12   sums necessary to remove and replace the pipe sold by JM together with additional

13   amounts according to proof.

14       158.   Plaintiff and the Class cannot restore to JM the pipe sold because such

15   pipe has been installed and cannot be removed and returned to JM at a cost which is

16   justified by the value of the pipe to JM.  Since the pipe has no market value,

17   especially after it has been installed and removed, it would be inequitable to require

18   the restoration of the pipe to JM.  Nonetheless, if JM desires the return of the pipe,

19   Plaintiff and the Class will agree to restore to JM such pipe on condition that JM

20   pay for the expense of removing and returning the pipe to JM.

21   **X.    PUNITIVE DAMAGE ALLEGATIONS**

22       159.   Plaintiff incorporates by reference each allegation set forth in the

23   preceding paragraphs.

24       160.   The intentional misrepresentation and concealment of material facts

25   alleged herein was fraudulent and despicable conduct that subjected Plaintiff to a

26   cruel and unjust hardship in conscious disregard of the Plaintiff's rights, so as to

27   justify an award of exemplary and punitive damages.

28

THIRDAMENDED CLASS
ACTION COMPLAINT

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of itself and all others similarly situated, pray that the Court certify this action as a class action and for judgment against JM and in favor of Plaintiff and the Class as follows:

1.      For restitutionary relief consisting of:

a.      An accounting against the JM for all sums collected from Plaintiff and the Class for the purchase of non-compliant PVC pipe;

b.      The imposition of a constructive trust for all such sums;

c.      For restitution and/or disgorgement of revenues, earnings, profits, compensation, and benefits which were received by JM as a result of such unlawful business acts or practices, according to proof;

2.      For a permanent injunction prohibiting JM, its agents, servants and employees and all persons acting in concert with it from:

a.      Representing in any manner that its PVC pipe is certified by any certification body unless: (i) the pipe was certified by the certification body; (ii) the pipe is manufactured in the same manner and with the same materials as the samples of the pipe used to obtain certification; and (iii) such certification was both obtained and is maintained for products manufactured after the date of certification in full compliance with all relevant rules and guidelines of the certification body;

b.      Representing in any manner that its PVC pipe meets standards defined by NSF, UL, ASTM or AWWA unless the pipe sold to purchasers meets such standards.

3.      For compensatory damages according to proof;

4.      As an alternative to the damages asserted in the Fourth through Seventh Claims for Relief, rescission of the sale of the pipe by JM to Plaintiff and the Class and the restoration to Plaintiff and the Class of all benefits conferred by them on JM together with such additional relief as is necessary to restore Plaintiff and the Class to the positions they would have enjoyed but for the conduct alleged

THIRDAMENDED CLASS
ACTION COMPLAINT

1   in the Fourth through Seventh Claims for Relief, all according to proof;

2          5.      For punitive damages;

3          6.      For pre- and post-judgment interest on such monetary relief;

4          7.      For Plaintiff's attorneys' fees;

5          8.      For costs of suit; and

6          9.      All other relief to which Plaintiff and the Class may be entitled at law

7   or in equity and which the Court deems appropriate.

8   Dated:  November 5, 2012          Respectfully submitted,

9                                     BIRKA-WHITE LAW OFFICES

10

11                                    By:

12                                        David M. Birka-White

13                                    David M. Birka-White (State Bar No. 85721)
                                      Stephen Oroza (State Bar No. 84681)
14                                    Mindy M. Wong (State Bar No. 267820)
                                      Birka-White Law Offices
15                                    411 Hartz Avenue, Suite 200
                                      Danville, CA 94526
16                                    Telephone: (925) 362-9999
                                      Facsimile: (925) 362-9970

17                                    John D. Green (State Bar No. 121498)
18                                    William R. Friedrich (State Bar No. 44731)
                                      Farella Braun & Martel, LLP
19                                    235 Montgomery Street, Suite 1700
                                      San Francisco, CA 94104
20                                    Telephone:  (415) 954-4400

21                                    Facsimile:  (415) 954-4480

22                                    *Attorneys for Individual and Representative
                                      Plaintiff* CAMBRIDGE LANE, LLC

23

24

25

26

27

28

- 40 -                              THIRD AMENDED CLASS
                                    ACTION COMPLAINT

1

## JURY DEMAND

2      Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff,

3   individually and on behalf of all others similarly situated, hereby demands a jury

4   trial.

5   Dated:  November 5, 2012            Respectfully submitted,

6                                      BIRKA-WHITE LAW OFFICES

7

8                                      By: _____

9                                          David M. Birka-White

10                                     David M. Birka-White (State Bar No. 85721)
                                       Stephen Oroza (State Bar No. 84681)
11                                     Mindy M. Wong (State Bar No. 267820)
                                       Birka-White Law Offices
12                                     411 Hartz Avenue, Suite 200
                                       Danville, CA 94526
13                                     Telephone: (925) 362-9999
                                       Facsimile: (925) 362-9970

14                                     John D. Green (State Bar No. 121498)
                                       William R. Friedrich (State Bar No. 44731)
15                                     Farella Braun & Martel, LLP
                                       235 Montgomery Street, Suite 1700
16                                     San Francisco, CA 94104
                                       Telephone:  (415) 954-4400
17                                     Facsimile:  (415) 954-4480

18                                     *Attorneys for Individual and Representative
                                       Plaintiff* CAMBRIDGE LANE, LLC

19

20

21
    25994\3299142.2
22

23

24

25

26

27

28

                                       THIRD AMENDED CLASS
                                       ACTION COMPLAINT